May it please the Court, my name is Natasha Taylor, and I represent Appellant Gemini Insurance Company. Gemini reserves three minutes for rebuttal. In this insurance coverage dispute, it is the plain language of the Lloyds policy, the arbitration award, and the club rules that demonstrate that the District Court erred when granting summary judgment in Lloyds' favor and denying Gemini relief. This Court should averse the decision for two independent reasons. First, the District Court misinterpreted the arbitration award and misapplied its findings as to charters' risks to deny fury coverage under the Lloyds policy. And second, contrary to New York law, the District Court narrowly interpreted the Lloyds policy and disregarded provisions in the club rules to reach its conclusions. Thus, Gemini is asking this Court to hold that there is coverage under the Lloyds policy and to remand back for further proceedings as to priority of coverage. Well, the key phrase in the policy is there are legal and or contractual liabilities to third parties under their, meaning the association's, club rules for charters' risks. So the question is, what does the club rules for charters' risks refer to? And is it your view that refers to the rules as a whole, the entirety of them? Yes, Judge. Wouldn't that incorporate all of the provisions of the rules, even though many of them are contradictory to other provisions in the policy itself? What we have in this case is a little bit unusual because Lloyds is taking its own standalone policy from, I believe it's 1996, and incorporating club rules from a different organization from 2015. And it doesn't necessarily all line up. But what we're looking at it is from the perspective of what Fury, the insured, would believe would be reasonable coverage. And what we can see is that when you are sent to the club rules, it's kind of like a book. But it isn't just the club rules. It's the club rules for charters' risks, which would normally you would think, okay, well, where in the rules do they talk about charters' risks? And that looks like part of Rule 4 in the addendum. And so maybe it just incorporates the coverage that's described there and not the rest of it with all these conflicting provisions. Why isn't that a reasonable and correct reading of the policy? Because Lloyds is the drafter of the policy. If it wanted to do that, it could have very easily done so. Instead, it contained a very nebulous, undefined term, charters' risks. And that's why the definition section, which Lloyds now says in the club rules is some sort of advisory definition, is really important in this case. Because what we see is when we look to the definitional section, owner includes the word charter, plain and simple. It doesn't say it's a demise or bareboat charter, which means something like an owner but just not necessarily the owner of the boat, but it has all the responsibilities. And it doesn't just say time charter. It says charter. And so when you go to the rules and you start with Rule 1 in the introductory section, you understand from the rules that Rule 2 is the standard cover in this case. That means that's the cover that applies to everything. But Rule 4 says that this section, Rule 4, applies to charters. Why isn't that enough? Why isn't that clear enough? Because it only applies if a written agreement is provided by the managers. And that's important because what Club Rule 2 does is it provides the broad coverage, and there's more than, of course, injury to a seaman. But injury to a seaman is one of the pieces that it covers, and that's legal liability for injuries to a seaman. Rule 4 is something a little bit more specific. What we see in Rule 4 is actually indemnity coverage, and that's why there has to be an agreement. Because what the association wants to do is if you want that type of agreement, if you want that type of coverage in which the charterer is going to indemnify the owner or the despondent owner, you have to have the association agree with you on that. And that's not what's at issue because this is really what you might colloquially call Rule 2 coverage and not Rule 4 1A coverage. Is that correct? It's not a contractual indemnity obligation. It's that two parties with tort liability are trying to figure out who, you know, pays what portion of their own liability. Yes and no, Your Honor. Yes, in that Rule 2 is for the legal liability part. But Rule 4, in this case, what CISPRI wanted from Fury was contribution. And although it wasn't contractual indemnity, it's contribution for money it already paid. It could. Who actually paid the money? CISPRI paid the money. And has anyone reimbursed CISPRI at this point? Any insurer? So CISPRI is the only one who paid. Gemini paid a million. And then CISPRI paid how much? So CISPRI, what happened originally is when the injury occurred to Seaman E.H., CISPRI went ahead and paid $11 million out of its own pocket. And then it brought Fury into the arbitration to dispute, of the $11 million, who was responsible for the $11 million, which is why the arbitrator decided 65% Fury and 35% CISPRI. And then in this case, Gemini paid the $1 million plus interest as part of the 65% for Fury and is disputing to pay that to CISPRI. And now is disputing who goes next. So no one else has paid CISPRI at this point? We have settled. Part of it is we have settled in part with CISPRI because CISPRI and the district court filed the DJ action against Gemini in this case. And to resolve our dispute with CISPRI, Gemini settled. That's part of the motion to dismiss, the motion to strike, motion practice that's before this court as well. But that doesn't really matter because what happened is we have declaratory judgment action in the district court. And so there is still a live dispute that Gemini has with Lloyds as to who is supposed to go next. And so what we see here is because the charter's risks, and we look at charters just a couple different ways. Courts look to, obviously, the time charter party agreement, and there is one here between Fury and CISPRI. And in that time charter party agreement, it's important to note that Fury was responsible for providing all instructions and sailing directions. We see that on page 328 of the time charter party. And then we have the spot party agreement, and the spot agreement basically is a specific agreement on page 325 of the record. And that shows the specific day when this charter was going to go out and accomplish the mission that Fury had hired the charter for. And the arbitrator clearly spells out in his award that Fury was hiring the charter to do a few different things, to deliver supplies and or fuel. And we know from the arbitrator's reward that this had happened before successfully. So the vessel had been put out there on December 29th, and it was this vessel, and it accomplished its mission using the mooring apparatus, and it did so in that case safely. But in this situation, when they're doing the water transfer, what happened is there was a break of the line and that injured EH. But the arbitrator did not necessarily determine that Fury as a platform operator, wearing solely a platform operator hat or distinction, was responsible. All he was tasked with was determining responsibility and liability. And he determined that CISPRI was negligent and that the negligence approximately caused the injuries. So is this liability in its capacity as charterer? Yes. And why is that? When looking at how the arbitrator viewed it, it's important to see kind of the timeline of events. And we see from case law, the Hodgin v. Forrest Oil case, and even in the Chan v. Society Expedition case from this court, that when a charterer gets involved and has a mission for chartering the vessel, that a charterer can be responsible and held independently negligent, separate and apart from the contractual provisions. And what we see here is it's important that when we have a job safety analysis occurred during this day, during the particular charter, we see that in the record. And in the record it states that the job safety analysis occurred between the platform operator and the captain. And it occurred to talk about the safety between the two individual entities related to both the cargo operation, which happened right before the mooring line snapped, and then the water transfer. So we can tell from the record that Fury is engaged in the chartering aspect of why it brought out the vessel for this particular aspect. Additionally, I think what you can see from the arbitrator's determination is that the arbitrator saw it wasn't just the negligent design and it wasn't just the negligent installation. It was everything. It was the use of the mooring apparatus. And the use of the mooring apparatus is what makes this case different from other cases because Fury was responsible for the use of the mooring apparatus. It's supposed to know when it's to be used safely. When can it use the size of vessel that it's supposed to use? When can it use it in the type of weather and the type of current? Do any vessels use that mooring mechanism other than chartered vessels? The record does not say, Judge Collins, but what we do know is the record does specifically show there are instances in which it was used specifically with a chartered boat. The December 29th with this particular boat was one charter, and the other example is the one that happened here. Lloyds makes the argument that this could be used with other vessels. That's hypothetical. That's not the evidence that's before this court. The evidence that's before this court is we know that it's solely used for chartered vessels, and it had been used before. And if this court is going to kind of pivot away from the charter's risk argument and go back to the rule argument, what I want to note is that we're looking at this from the perspective of Fury and what Fury understands to be what it's being insured for. And although we look to the writing and we see that there is no written agreement for Rule 4, it's the same thing for the addendum for charters. The addendum for charters, you don't just open it up and go to the addendum for charters because what we see at the top of the page for the addendum for charters on page 715 is it specifically says that the addendum for charters provides the addendum, contains the full wording and clauses, which may be incorporated where contractually agreed on behalf of a charter by means of short-form reference of such a clause in the certificate of entry or in the endorsement slip. But if the policy is just incorporating their club rules for charterers' risk, for charterers' risks, and you're trying to find out what charterers' risks are, why isn't that just a cross-reference to the description of charterers' risks and not necessarily to, well, you have to specifically adopt this part of the policy? It's a cross-reference. And so it's a cross-reference to charters' liability and respective risks set out in Rule 2. That seems to fit charters' risks. Because the cross-reference, what could happen in this situation is when you have the Lloyds policy and you go to the club rules, you still have to read the provisions of the rules themselves and make sure that you're abiding by the rules themselves. You can't just skip over the written agreement part. That's what's important in this case. You have to go to those rules and see that there's a written agreement between the members, and there is not, indisputably, and see if the certificate of entry or the endorsement slip is attached to the record that shows us that we get this addendum, and we don't have that. I don't understand why you're referring to the addendum. The addendum, as I understand it, doesn't help your position because it clearly states that the insurance covers the liability of the above-named members in his capacity as charterer. So why does that help your position? It helps the position in that there needed to be a written requirement. And so to get to the addendum, there has to be a written requirement. And Lloyds could have easily done that. They could have easily done that in its section of the insurance policy when it said club rules for charters risk, specifically, comma, in rules 4 and in the addendum for charters, and there doesn't need to be a written agreement as stated in those particular documents. It is the drafter of the policy, and we construe things against the drafter of the policy. Your Honor, can I reserve the rest of my time for rebuttal? All right. Thank you, counsel. We'll hear now from Ms. Madison. Good morning, Your Honor. May it please the Court. My name is Katie Madison, and I represent the syndicates at Lloyds of London that subscribe to the charter's legal liability policy. The primary question in this case, as we see it, is who is liable for a defective moorage device that was affixed to a natural gas extraction platform that was not a vessel under 1 U.S.C. 3, and the moorage platform snapped at the platform itself. The wire snapped. It was defective. The moorage device was installed. Can we get straight to the relevant insurance question? Yes, absolutely. Which is what this cross-reference is. What does it mean to say club rules for charters risk? Does that mean any liability of a charter under the rules that's covered, or does it mean just what's in Rule 4? Because charter is unadorned within the definition of owner, which plugs into Rule 2. So why isn't club rules for charters risks Rule 2, among other things? So the UK P&I club rules, that's a mutual assurance association in which many large vessels, container ships, cruise ships are enrolled. The rules themselves provide broad coverage to owners or bare boat charters. This is a time charter, and there is discrete coverage provided to a time charterer or a voyage charterer for its liabilities as charters. The definition of owner in the rules says charterer. It does not say demise or bare boat charterer. It says charterer. Yes, it does, Your Honor. So why isn't that enough to plug it into Rule 2, and therefore Rule 2, with that understanding of owner, is one of the club rules for charters risks? So the policy itself, the policy language, did attach a copy and was subject to the charter party that existed between Fury and Cyspre. Also, a time charter is a limited type of charter. It's more like an Uber. It's not like renting an automobile, which is bare boat charterer, which bare boat charterer is a type of species of ownership pro hoc vicee. It would, the actual Rule 4, it clarifies that it only applies to time charters and voyage charters. Also, the charter party that is attached to the policy reflects that the owner, the vessel owner, Cyspre, retained control under the general maritime law. It's well settled that the owner of a boat that is time chartered is responsible for the operational control and the seaworthiness of the vessel. So it would really— I guess I'd like a pretty specific, clear answer. What does the reference to club rules for charterers risks mean? What are the club rules for charterers risks? They are constrained by the charterer's addendum and also incorporate Rule 4. Your position is that club rules for charterers risks just means Rule 4 and the addendum and not Rule 2? The only way that— Can I get a yes or no to that question? Maybe. And if I could give you a qualification, Your Honor. The only way that Rule 2 would ever apply is if the charterer took some action beyond its obligations under the charter. For example, in the line of cases that the appellant cited, the Graham v. Milky Way, the Hodgkin case, in that line of cases, the time charterer took action in which the charterer was actually controlling the operation of the boat. Are those those Fifth Circuit cases? Yes, they are. I think there's a Second Circuit case. And there is a Ninth Circuit case, the Chan v. Society Expeditions, in which the time charterer took control of the boat. In those narrow circumstances, a time charterer could be liable for the death or personal injury of a Jones Act seaman. We don't have — those cases are factually distinguishable, Your Honor. We don't have that scenario here because the charter is very specific and the arbitrator— I want to understand, in that situation, where the charterer takes over the operation of the boat, you say that they would — that the phrase, in that circumstance, the phrase, Club Rules for Charterers' Risk, would include Rule 2 as to a charterer who took over the whole boat? Who took over control and exercised operational control. How do you get that out of the phrase, Charterers' Risk? I'm not fine. I mean, you could have had a really clear reference in this policy. We incorporate this rule, that rule, this subprovision. Instead, you use the general phrase, Club Rules for Charterers' Risk, and then the rules are long and complex, and it's very unclear what's being incorporated by cross-reference. Those rules would only apply, and primarily Rule 4 applies, if there is some negligence of the charterer in its capacity as a time charterer that causes damage to the vessel, damage to the crew. Correct, but then I don't understand. I understand that argument, but then I don't understand why you said that the charterer who takes over the boat could have Rule 2 coverage and that would be Club Rules for Charterers' Risk. I didn't get that. I just don't see how that comes out of the language. That would be — It seems contrary to the concession. It seems contrary to your own argument. I can only — and, Your Honor, that is not what the arbitrator found, and that is not what the district court found, that the charterer exceeded his duties and responsibilities as charterer. You asked me if there were ever a scenario in which that could occur. Perhaps Rule 2 could apply if the charterer did something, which is not the fact pattern here. I understand that, but why would that then be considered Club Rules for Charterers' Risk? Linguistically, how would that scenario fit within that phrase? Explain that to me. I think there would then be a big dispute if the charterer exceeded its responsibility and its duties as the charterer because the policy was subject to the charter party itself. There likely would be a coverage dispute about whether that was, in fact, covered. But if the charterer — Because then they're not acting as a charterer. That's right. So that's actually the answer, correct? Yes. Okay. That is the answer. But if that's the case, then why is it a Club Rule for Charterers' Risk? To go back to, I think, Judge Collins, like maybe there's some other way that Rule 2 comes into play, but how does that come into play as a Club Rule for Charterers' Risk, Rule 2, under your scenario where they just take over the boat? Well, it would come into play if you had a situation in which perhaps the charterer brought cargo on board and it caused damage to the vessel or damage to a crew member. There is a case that is relied upon by appellants, and it's a 1929 case in which a charterer brought on board and stowed explosives under a leaking engine. That perhaps, stowing cargo on board a boat negligently. So this argument — but just to be clear, your argument seems pretty clean to say Club Rules — I mean, it's not super clear, but it seems cleaner to say Club Rules for Charterers' Risk is the charterer's addendum and Rule 4. Yes. But then I think Judge Collins' question was, yeah, but now you're seeming to be conceding that no, but it also reaches out and grabs Rule 2 in certain — like the phrase Club Rules for Charterers' Risk reaches out and grabs Rule 2 for some purposes. That starts to feel really complicated. So all that's built into that one phrase, that it reaches out in some purposes but not the purposes applicable to this case. And I'm not looking at Rule 4, Your Honor, right now. However, if the charterer is liable for — causes negligence, and I think Rule 2 is the only rule that specifically relates to personal injury or death of Jones Act semen. So is that — so maybe that's your argument then, that Rule 4 does refer back to Rule 2 in certain circumstances. So that's how you get there is Club Rules for Charterers' Risk is the addendum and Rule 4, but Rule 4 in certain circumstances goes to Rule 2 but not in circumstances in this case. That would be in the event that that would be a type of injury to a Jones Act semen or death would be a charterer's liability that is insured against. But again, the — this policy only incorporates charterer's liability. An owner would, of course, and most of the Club Rules are geared toward owners of boats necessarily have liability for any crew members that they employ that are on the boat for negligence. Well, looking at the addendum, if we do agree with you that we should be looking at the language of the addendum, what it says is this insurance covers the liability of the above-named member in his capacity as charterer in respect of risk set out in Rule 2. And then there's a further clause about indemnity. Why isn't this a liability of the member in his capacity as charterer in respect of risk set out in Rule 2? Well, Your Honor, it's not because here this was a platform liability. This was platform equipment. This had absolutely nothing to do with the vessel. It was — That's obviously untrue because it's about connecting the vessel to the platform and the mechanism for doing it. So it's the interface of the two things. So it's both as platform operator and as a charterer that I'm bringing this boat to my platform and I'm going to connect it to my platform. So I'm kind of wearing two hats at that point, aren't I? No, Your Honor, because actually the wire rope snapped at the platform itself. It did not snap at the vessel. Also, the arbitrator and the district court found that the operation was otherwise unremarkable, and but for the snapping, the moorage there, the connection, that but for the wire rope snapping at the platform and but for the negligence of fury in deviating from the design, the safe design of the platform, that this event never would have happened. It also wouldn't have happened if they hadn't tried to attach the boat to it using this mechanism. I mean, the charterer has a responsibility not to kill and injure the people that it brings out to the platform and that in the process of trying to attach it to the platform, they don't kill and injure them. Why isn't that in this capacity as charterer? So the arbitrator found that the operation and control at the time of the hookup was unremarkable, the sea conditions were unremarkable, that the vessel was under the control of the crew and the captain, that the captain was negligent because he failed to make sure that crew members were outside of a safe place to stand. And when the wire rope snapped at the platform and snapped down, unfortunately E.H. was injured from the wire rope coming off the platform. There's no factual issue that the mooring device broke at the vessel or that fury was directing the course of the vessel and the operation at that time. Thank you. All right. Thank you, counsel. Thank you. We'll hear rebuttal now. May it please the Court. Judge Collins, you hit it on the head. It is the interface between the platform owner and the charterer in this case that has Fury wearing two hats. And we see that from the record. The arbitrator was clear that this was a joint mission. And the case law does not state, contrary to what opposing counsel just said, that it is the control of the boat alone that shows that somebody is acting as a charterer. It's way more than that. The Hodgkin case, the Milky Way case, this Court's decision in Chan v. Society Expedition, as well as the Alexander v. United States case from this Court, what we see here is we see certain situations in which time charters have additional duties to be diligent, to be safe, reasonable expectations in doing a mission. And so specifically, selecting a time for the vessel to conduct its mission, ensuring that the mission assigned to the vessel can be accomplished safely, and importantly, exercising reasonable care in the activities in which a charterer participates or exercises control. So Fury in this case did not need to be in control of the vessel. Was it known in advance that they would have to hook it up? Because am I correct that they only had to do that for one phase of the offloading? The record shows that the only mandatory time when the mooring apparatus is used is when there's a transfer of fuel because they're worried about fuel spillage. But in this case, we know that the captain and the platform operator discussed during the joint meeting, the job safety analysis, that there would be a water transfer to do, when using the mooring apparatus, using the water transfer. So they only used it for the water transfer, and that was planned in advance? I don't think that was planned in advance, Your Honor. Your Honor, I don't think that's what the record reflects, but the record reflects that after the meeting, both the platform operator, Fury, and the vessel owner, Sisbury, knew that that's the way that they were going to use the water transfer. They were going to do it via mooring apparatus. But let me see if I understand. Those cases that you cite where the charterer sort of exerts control more over the situation, more over the ship, all of those cases have to do with, again, bringing on explosives under a ship or sailing into a storm. But this situation was different, wasn't it? I mean, how is what happened here similar to those other cases? And I see I'm out of time. In this case, it's similar. It falls a little bit in the cracks of those cases. A lot of those cases do talk about transferring passengers, the ingress and the egress, and generally a vessel owner is responsible for that. But those cases discuss the concept that when a charterer calls out a vessel in a time that is not safe to do its particular mission, then it can be held responsible. And here we have where the arbitrator determined that the mooring apparatus was to be used in this case, and the mooring apparatus was not safe. And it was not safe specifically not just for the design. Counsel stressed that it was just the design that the arbitrator found was to be the negligence. But Fury was negligent on page 316 of the record, and not knowing for what vessels, tonnage and size, in what circumstances, state of the tide, current, wind force direction. And he does note in his arbitration award that there was a strong current coming out of the north. It was safe to permit using the mooring apparatus. And why that's important is because the vessel owner in this case turned off the engine and it was guided by the tide and the current to create this tension. And the fact that Fury's employees did not know how to use the mooring apparatus for the sole purpose of doing the thing that it chartered the vessel for, which was to attach to the boat and transfer the supplies, again, the mission that Fury had, that is what makes this very similar to the cases in Hodgin and the Fifth Circuit as well as this court's cases. All right. Thank you, counsel. Thank you, Your Honor. We thank both counsel in this case for their helpful arguments. And the case just argued will be submitted.
judges: COLLINS, VANDYKE, MENDOZA